IX

mouth, face, head and to kick him in the back. Plaintiff tried to keep his face protected by not allowing them to handcuff him while they were on his back. At that point, Lt. Stanton came into cell and maced Plaintiff twice, forcing two QRT① officers to run out of the cell because of inflamed lungs.

After being brutalized for about ten minutes, Plaintiff was brought out of cell, bleeding from mouth and nose, with front two teeth of denture knocked out. Plaintiff was then taken to nurse, where nurse Courtney Doe took cursory blood pressure of Plaintiff and asked whether any officers were injured. She never asked Plaintiff about his injuries nor applied any treatment for Plaintiff's bloody mouth and nose or pain. Before taking Plaintiff to Bldg. 18C, "the hole", C/O Neal and C/O Mike Doe taunted Plaintiff by saying that "this is just the beginning, it gets worse in 18." Lt. Stanton then gave QRT① a thumbs up sign and told them "good job" as QRT① took Plaintiff to Bldg. 18.

When QRT① was outside of Bldg. 18, C/O Mike told Plaintiff that "he had to be the stupidest nigger in jail." C/O Neal, who is African-American, said "I know that's right." C/O Mike then told other QRT officers "to watch out for the cameras." Just before Plaintiff entered Bldg. 18 and out of view of cameras, C/O Neal hit Plaintiff with a solid hard blow flush on the face that swelled up the entire right side of Plaintiff's face. QRT① officers then slammed Plaintiff to the floor, while still handcuffed and shackled, and dragged him to the cell. They then left him in the cell, bleeding profusely from nose and mouth.

Nurse Courtney Doe was then summoned, along with Lt. Stanton, to Bldg. 18. As Plaintiff was bleeding profusely from nose

X

and mouth on the floor, Nurse Courtney Doe falsely wrote that Plaintiff had suffered superficial cuts in the medical report.

After being left in the cell for about two hours with no medical treatment and having lost over a pint and a half of blood, morning Sgt. took Plaintiff to see Nurse. Nurse Cindy Doe asked Plaintiff whether he was in pain. Plaintiff stated that "he couldn't feel anything on right side of face and needed something to clean blood from face, mouth and nose." Nurse Cindy gave Plaintiff one Motrin and four sips of water and said that "all he needed to do was take a shower to clean dried blood off his face." In all, Plaintiff suffered busted nose, mouth, loss of two front teeth to his broken denture, swollen fractured jaw, and partial paralysis of his nose and facial muscles. Plaintiff was not able to eat solid food for approximately two weeks.

When Plaintiff was released from 1SC on 08/19/03, Capt. Sagers, Deputy Warden McGuigan, Lt. Harvey, and Lt. Seacord again showed deliberate indifference to Plaintiff's safety by placing him on same tier where he had altercation with Sgt. Evans, so the abuse and harassment could continue. Immediately, Sgt. Evans began his harassment by saying that he was not going to feed Plaintiff. Lt. Gattis came down to tell Sgt. Evans to feed Plaintiff. Even though Lt. Gattis, who is black, was Sgt. Evans's supervisor, Evans told me that "he didn't give a damn what Gattis said." Lt. Gattis said nothing about this insubordination and continued to behave like a "house negro", whose only purpose was to cater to white establishment. Eventually, Lt. Gattis was able to persuade Sgt. Evans to feed Plaintiff.

## XI

After about a week, Sgt. Evans began to serve food unsanitarily again by telling his officers to not wear headgear when serving breakfast in order to provoke Plaintiff. At one point, he used racial tactics by asking "why Plaintiff didn't say anything when black guy was not wearing hat." After telling same officers to wear headgear with no results, Plaintiff threw his tray outside and told officers that "if they served trays like dogs, then he would make them fetch trays like dogs." Lt. Roe and Lt. Bartels would consistently write disciplinary reports against Plaintiff, but refused to reprimand wayward staff for violating health and safety institutional rules.

In retaliation for throwing trays outside, Sgt. Evans again began to refuse to feed Plaintiff. Plaintiff continued to file grievances to no avail; therefore, Plaintiff resumed practice of throwing urine at officers in order to get them to serve him breakfast. Again, Lts. Roe and Bartels wrote disciplinary reports against Plaintiff, but refused to reprimand wayward staff for refusing to feed Plaintiff for sadistic and malicious reasons.

Finally, on Oct. 8, 2003, Shift Commander Staff Lt. Burton was summoned to Bldg. 17 after Plaintiff had barricaded his door and refused to allow Sgt. Evans and staff to do security checks and phone punches after they refused to feed him breakfast. Plaintiff had threatened to throw urine on officers for not feeding him. Staff Lt. Burton ordered Plaintiff to come out of cell for shakedown to search for weapons. After five to ten minutes, Staff Lt. Burton found no illegal contraband and allowed Plaintiff to return to his cell. Staff Lt. Burton then ordered SHU officers to feed Plaintiff.

## XII

On two nights later, Plaintiff was brought to Bldg. 20 for transport to court. C/o's Connolly, Blankenship and Davis then doubled back to shake down Plaintiff's cell while he was not present. During this time, Plaintiff's radio was taken and broken antenna was planted in his door in retaliation for Plaintiff's complaints against staff. The confiscated radio was given to Lt. Bartels, who refused to tell Plaintiff what he had done with radio, despite repeated requests by Plaintiff. He claimed that Capt. Sagers could not do a disciplinary report without 537 property form with radio. Plaintiff was never given a hearing for disciplinary report or shown alleged evidence of radio.

On Oct. 14, when C/o Connolly tried to put coffee on flap during breakfast, Plaintiff pushed coffee away and declined, spilling coffee on C/o Connolly. When Plaintiff asked him where the radio was, he stated that "he had given it to the Lieutenant." He and Sgt. Evans then fabricated disciplinary action against Plaintiff by saying that Plaintiff had thrown coffee at C/o Connolly.

Later on in the morning, Capt. Sagers sent Lt. Harvey and C/o Rainey to Plaintiff's cell, who had jammed his door. Capt. Sagers and Lt. Harvey then ordered maintenance to cut open Plaintiff's door. After door was cut open, QRT 2 officers rushed Plaintiff, who was lying down in submissive position, and began to punch him in arms, legs, and back while C/o Gardels began choking Plaintiff, temporarily causing unconsciousness. Lt. Harvey removed Plaintiff's shoes and socks and forced Plaintiff to walk barefoot to isolation cell. After speaking to Capt. Sagers, Lt. Harvey watched silently as

XIII

c/o Gardel's first elbowed Plaintiff in the head and then punched him in mid-section, all while handcuffed and shackled. Finally, when Plaintiff got to isolation cell, c/o Gardels punched Plaintiff in the mouth while QRT ② officers bent Plaintiff's arms in dangerous positions in order to cause extreme pain and cuts and bruises to his wrists.

## II. DENIAL AND LACK OF ADEQUATE MEDICAL CARE AND UNSANITARY CONDITIONS

After Plaintiff was transferred to SHU, he began to experience health complications due to unsanitary living conditions and lack of exercise time. Even though most state and federal institutions mandate one hour of free exercise time per day outside of one's cell, Dcc officials have abridged free time to approximately 19 minutes per day or two hours and fifteen minutes per week. Inmates are only allowed time to exercise out of one's cell three times per week. This has caused complications to Plaintiff's health as he has experienced heart and chest pains and shortness of breath. Because Plaintiff has a high risk of diabetes because of family history, the lack of exercise is causing anxiety and stress due to health symptoms.

Furthermore, inmates are denied free time to exercise inside from extreme hot or extreme cold conditions because SHU officers consistently force inmates to use outside facilities in sub-freezing temperatures or extremely hot ozone-dangerous days. If inmates do not use open outside facilities during this time, they are denied free exercise time. Also, because dust and

## XIV

filth have accumulated in outdoor and indoor yards for past two years, without disinfectant or any fumigation of bugs and ants, inmates are constantly susceptible to flu, hay fever, and emphysema.

After putting in several sick calls for toothaches and broken teeth, Plaintiff was finally allowed to see dentist and get treatment six months later. Complications were further caused by SHU policy of not allowing denture cleanser or cream for Plaintiff's partial denture. For almost two years, his grievances and complaints were denied by SHU staff and DOC Bureau Chief and Commissioner.

In mid-summer, 2002, Plaintiff developed an unknown painful rash in his genital area. First Correctional Medical staff refused to tell Plaintiff medical condition and only applied antifungal cream to genital area. Plaintiff had earlier complained about unsanitary conditions of ants, maggots and bugs crawling in his cell and SHU staff refusing to disinfect and spray tiers and cells. Plaintiff also had complained about SHU officers refusing to give inmate tier worker enough time to thoroughly clean tiers and showers, further increasing chances of infectious and contagious diseases. Inmates have not been allowed to mop their cells in the past two years.

In Feb. 2003, Plaintiff awoke and found that the genital infection was causing him extreme burning sensation and discomfort to the point that he could not wear underwear. Sgt. Moran and c/o Atkins brought Plaintiff to see Nurse Administrator Brenda Holwerda, who asked to see Plaintiff's genitals. Immediately

## XV

after seeing Plaintiff's genitals, Nurse Brenda Holwerda yelled to officers, "He has an STD. You all make sure that you wear gloves around him." After blabbing Plaintiff's confidential medical information, Nurse Brenda then told Plaintiff that "he must have gotten it while on the street and that he needed to go back and find out who he had contracted it from." This caused much anxiety and embarrassment to Plaintiff as officers blabbed to other inmates and officers about Plaintiff's medical condition and made open mockery by making sure that everyone saw that latex gloves were used when touching Plaintiff.

When Plaintiff was seen by physician, Plaintiff was told that he had contracted a bacterial infection, but it was not an STD as Nurse Brenda had misinformed Plaintiff. He then ordered a six-week treatment for order to remove lesions. After being trained to apply ointment and acid to area, Plaintiff began to apply treatment himself for the next two weeks.

When Nurse Brenda brought prescribed medical treatment to Plaintiff, she told him that "she was going to stand and watch Plaintiff use it." Plaintiff asked in astonishment why she needed to watch Plaintiff apply ointments to his genitals. She stated that it was the correct procedure and even though other nurses had given him privacy, that she was the Nurse Administrator and the other nurses were wrong. When Plaintiff began to further question her motivation for being a "voyeur," she became angry and snatched back medication and refused to give it to Plaintiff, forcing him to suffer genital pain for another week. She then fabricated medical report and stated that Plaintiff had refused medication.

## XVI

After Plaintiff was brutally assaulted by SHU officers on 07/27/03, Nurse Courtney Doe fabricated medical report to say that Plaintiff had suffered superficial scratches when she saw Plaintiff lying semi-conscious in a pool of blood. She refused to give Plaintiff any medical treatment.

Later that morning, 8-4 Sgt. brought Plaintiff to Nurse's Station. Nurse Cindy Doe saw Plaintiff's swollen bloody face and asked whether he had pain. Plaintiff said "yes." She then gave Plaintiff one Motrin and four sips of water and told guard that she was done with Plaintiff. When Plaintiff asked whether she had any ice or medication to put on his cuts and shrink swelling, she stated that "she did not have any ice and because blood flow had stopped, Plaintiff would just need to wash blood off face." She then refused to give him any napkins or cleanser to clean his face.

Later that night, Nurse Brenda came to Plaintiff's cell in isolation to "gawk at" Plaintiff's injuries. When Plaintiff asked her whether he could see doctor, she told him that "his injuries were not serious and all he had to do was to wash his face." She further stated that she did not see any swelling and there was nothing written about Plaintiff's broken jaw. Finally, she told Plaintiff that "he shouldn't have started a fight with the officers," showing her callous disregard to Plaintiff's health and safety.

Plaintiff had complained to Sgts. Carpenter and Shaw and Lt. Forbes about not being able to move right side of face or to be able to eat any solid food. Plaintiff was told that he had suffered possible

## XVII

fractured jaw and could only suck soft food and vegetables. Again, officers refused to refer Plaintiff to medical; however, Sgts. Carpenter and Shaw and c/o Moore ordered an impromptu shakedown in isolation in order to confiscate Plaintiff's totally bloody T-shirt and destroy evidence of brutal assault.

Despite repeated requests to Nurse Brenda and Nurse Cindy Doe while in isolation to see doctor, Nurse Brenda instructed all medical staff to deny Plaintiff's request. All requests in isolation had to be made verbally because inmates are not permitted to write requests for medical while in isolation. Meanwhile, Plaintiff continued to have numbing, throbbing pain in head and right side of face. He also could not breathe or sneeze out of right side of nose as his nasal passages and right side of face were numb and paralyzed. He also had two front teeth knocked and had lost his glasses during brutal assault.

Plaintiff managed to get another inmate to smuggle letter to his mother, detailing the brutal assault, his injuries, and lack of medical treatment. Plaintiff's mother then contacted Warden's Office and was transferred to Deputy Warden McGuigan, who covered up assault by saying that "officers did not assault Plaintiff while handcuffed, and that Plaintiff had only suffered superficial cuts and smeared blood on face." Plaintiff's mother wisely rejected this dubious alibi and contacted State NAACP, where she happened to speak to Ms. Camille Pringle of the Delaware Center for Justice (DCJ). DCJ oversees and certifies inmate grievances for the DOC. Ms. Pringle told Plaintiff's mother that she would contact someone at DCC immediately.

After Warden's Office was contacted, SHU medical staff was ordered to take an X-ray of Plaintiff's face and jaw. However, Nurse

## XVIII

Brenda decided to further delay treatment by diverting Plaintiff to be seen by Mental Health Counselor, insinuating that Plaintiff's problems were psychological, not physical.

Later, she brought Plaintiff to Nurse's Station and tried to interrogate him about his fractured jaw in order to prove that Plaintiff was lying about his injuries. Plaintiff told Nurse Brenda that "he realized that she was part of the conspiracy to cover up his brutal assault and injuries, but he still was demanding an X-ray." She then reluctantly conceded and allowed Plaintiff to have his jaw x-rayed for possible fracture after ten days.

Even though Plaintiff was told by X-ray technician that X-rays would take about a week to get results, Nurse Brenda came to Plaintiff the next day to tell him that X-rays were negative. When Plaintiff asked her how did she get results so fast, she stated that she had called doctor personally to get results. Plaintiff then asked for copy of x-ray report. She said that Plaintiff would need to contact Warden about releasing medical information. Plaintiff has never been provided official medical reports, despite repeated requests and grievances to administrators. Despite request to Dr. Arronburl to see specialists about facial paralysis and pain in jaw, Plaintiff was denied any pain medication or follow-up. Instead, he was forced to "heal on his own." This has caused permanent disfiguration and paralysis to right side of Plaintiff's face.

After Plaintiff was released from isolation, he was transferred to cell, where his only bedding was "egg-shell" foam, causing him back pain and spasms. After he was finally given Motrin for back pain in Oct. 2003, he was again assaulted by SHU officers on Oct. 14, 2003. This caused

XIX

him additional back pain and x-ray was taken in December, 2003, where he was shown x-ray with compression on his lower lumbar region. Dr. Arronburt said that x-ray results were negative without referring to back specialist. Plaintiff continues to suffer chronic back pain and spasms. SHU Medical Staff continues to "medicate it" by repeatedly prescribing Motrin without any referral to back specialist.

Plaintiff has also been forced to wear same T-shirt and underwear for last eight months as SHU officers refuse to provide him with required clothing as other inmates, forcing him to be naked underneath jumper on dirty laundry days, further chafing him and irritating his genital infection.

Meanwhile, even though Plaintiff had suffered loss of front two teeth to his partial denture and had bleeding gums and difficulty eating solid foods, First Correctional Medical (FCM) staff delayed and denied him dentures until late Dec. 2003, a period of five months. Even though Plaintiff is legally blind and has been without eyeglasses for past seven months, he still did not receive glasses until recently, further causing him chronic headaches and difficulty reading and writing.

Finally, because SHU inmates are required to wear black "boxes" by DOC Policy in order to punish and further restrict SHU inmates' hand movement, this has resulted in pain and cuts and bruises to Plaintiff's wrists, causing numbness. After repeatedly being subjected to restrictions during court transportation, Plaintiff began to experience pain in upper shoulders and chest due to chain belt restraints. SHU Medical Staff and Dr. Brown delayed medical treatment until Plaintiff began to experience heart palpitations and shortness of breath. Fearing that he had symptoms of heart stroke and to

XX

avoid heart attack, he requested to see doctor, who prescribed muscle relaxer for Plaintiff's chest and shoulder muscle strain and pull.

In order to further demean and degrade Plaintiff and inmates, Nurse Brenda Holwerda invented the policy of pouring medication in inmates' hands instead of placing it in cups on vent as all medications are designed to be. She also reinstituted policy of watching inmates take medication. Because Nurse Holwerda designed these restrictions specifically for Plaintiff, he refused to accept them and told Nurse Brenda that he would take his medication after it was placed on vent. Nurse Holwerda then decided not to place medication on vent and refused to give Plaintiff muscle relaxer treatment, so that Plaintiff could continue to have heart pain and shortness of breath. All complaints to Medical Director and Grievance Committee concerning Nurse Holwerda's racist treatment toward Plaintiff and other black inmates have been denied or ignored. She has also made false disciplinary reports against Plaintiff and filed criminal charges against black inmates in order to further harass and punish them.

C. LEGAL ACCESS AND RIGHT TO COUNSEL

After Plaintiff was placed in isolation on Feb. 22, 2002, he was denied all access to legal documents while he was pro se defendant in jury trial. On first day of trial, prison officials did not bring legal documents to court and Plaintiff was forced to begin trial without legal documents. Even after court ordered legal documents to be returned to