~~XXI~~

Plaintiff while in isolation, prison officials, citing policy, told Plaintiff that no property, legal or religious, was allowed in cell. Hence, Plaintiff was forced to conduct his trial with inadequate preparation in his defense and denied his right to effective counsel, as he continued to have to make up questions and plan strategy in the middle of proceedings. After a three day trial, Plaintiff was found guilty of two of the three charges on Feb. 28, 2002.

After Plaintiff was transferred to SHU from isolation on Mar. 8, he was denied paralegal services like non-SHU inmates have access to. Inmates from SHU had to write legal question on SHU law library request and send it to Inmate Paralegal in Main Law Library. Not only was this inadequate assistance, but it invaded confidentiality of legal issues and did not allow inmate to discuss merits of his case. Because prison policy does not allow SHU inmates to commingle with non-SHU inmates, SHU inmates are denied personal contact with inmate paralegals. However, SHU inmates are allowed to have personal contact with general population barbers, in contradiction of policy. Furthermore, represented SHU inmates are allowed to speak to counsel through closed visits, but non-represented SHU inmates are denied paralegal assistance that non-SHU inmates have.

In January, 2003, SHU Law Librarian Brian Engram confiscated Plaintiff's legal letter from SHU inmate Ron Proctor and filed a disciplinary report. The letter was in response to complaint to U.S. Dept. of Justice, detailing incidents of inmate assaults that resulted in serious injury and death in DOC that Dep. Attorney General and prison officials had suppressed and covered up. This incident prevents SHU inmates from filing class action suits because prison officials do not allow collaboration on legal claims.

## XXII

Hearing Officer Lt. Larry Savage never returned Plaintiff's legal letter to him, even though prison policy mandates that confiscated legal papers be returned to owner. Later, Plaintiff began to have U.S. Dept. of Justice mail "inadvertently" opened by DCC Mailroom Officers. At one point, DCC officers opened Plaintiff's legal mail and deposited highlighted case law that allowed for incidental openings of legal mail in retaliation for grievance filed by Plaintiff.

From Oct. 2002 to Oct. 2003, SHU Law Librarian Brian Engram continued to cause Plaintiff's legal requests a one-to-two week delay, whereas general population consistently received legal requests within one to two days. This caused Plaintiff to file ineffective and cursory briefs to court in order to meet court deadlines and sometimes caused him to miss court deadlines. Grievances and complaints to Mr. Engram's supervisors, Mike Little and John Ryan were denied.

Mr. Engram also refused to make several legal copy requests, stating that grievances were not considered legal material, even though grievances fall under 1997e(a) PLRA exhaustion requirement. In order to deter inmates from filing legal claims, prison officials instituted policy of 25¢ per page copy. This is higher than 15¢ per page court copy machine fees in state courts. Inmates who have voluminous and complicated legal briefs and appendices with several state and federal cases have amassed thousands of dollars in legal copy fees in a few years. Indigent inmates are forced to forego legal copies and copy briefs by hand instead of acquiring legal copies because of potential for hundreds

## XXIII

of dollars in debts for copy fees. Furthermore, the prison refuses to distribute or sell carbon copy sheets to help alleviate exorbitant copy fees. Inmates are released with hundreds and thousands of dollars in prison debt with very little means of repaying debt, further creating risks of recidivism and crime.

While in isolation in March, 2002, and August, 2003, Cpl. Kromka and property officers lost or discarded portions of Plaintiff's court transcripts and legal material and blue binder tablet that contained pertinent notes and case law for his appeals. SHU staff also unfairly restricts number of legal books and/or magazines to two and discards or prevents inmates from pursuing legal education and paralegal courses. Most of this material cannot be duplicated and is forever lost. Plaintiff and other inmates are coerced into signing property release and liability forms before regaining property. Hence, inmates could not discover missing items until after property form was already signed by coercion.

Furthermore, while in isolation from Feb. 22 - March 22, 2003, Plaintiff was denied all access to legal material and access to courts. This occurred while in jury trial and denied him adequate defense while he was a pretrial detainee. In August, 2003, he was unable to file timely motion and appeal due to his isolation status and denial of access to courts. He was unable to file reply brief in his post-conviction relief case.

Finally, beginning in January, 2004, Plaintiff and other inmates have been forced to pay postage for all mail, including legal mail, in another cost-cutting move that effectively denies inmates access to courts. Even though Commissioner Stanley Taylor originally

XXIV

proposed that only personal mail would require postage, and legal mail would still be mailed at state expense at General Assembly Budgeting Hearing, he did an about-face after receiving funding and reneged by stating that all inmates would be required to purchase postage for legal mail.

This resulted in Plaintiff and other inmates having legal mail returned to them by Cpl. Oney from Mailroom. Furthermore, inmates could only buy postage stamps every two weeks from commissary and policy sets limits on amount of purchases, depending upon inmate's Quality of Life (Q.o.L.) level. Also, Mailroom officers refuse to mail letters and debit accounts, similarly to sick call fees and legal copy fees. Hence, letters without postage stamps are returned and inmates are totally denied access to courts. Plaintiff has filed several motions late and had to file current lawsuit later because of DOC stamp policy. Inmates have continually had claims go unfiled or be denied by courts for late filings because of DOC stamp policy.

## DISCIPLINARY PROCEDURE AND RETALIATORY SANCTIONS

DCC Hearing Officers and DOC prison administrators continue to trample Plaintiff's and other inmates' constitutional rights by denying them due process before punishment. DCC Hearing Officer Staff Lt. Bernie Williams, Captain Gloria Green, and Lt. Larry Savage continue to show bias against inmates' version of facts even when evidence is overwhelming in inmates' favor, creating an institutional "Kangaroo court." Lt. Savage has also continued to deny

XXV

inmate appeals by refusing to send them to Appeal Officer, Anthony Rendina, who supports Hearing Officers' biased findings.

While a pretrial detainee in isolation from Feb. 22-Mar. 22, 2002, Plaintiff was denied a hearing. He was given cursory hearing by Staff Lt. Williams in April, 2002, and found guilty of disciplinary charges. Staff Lt. Williams then refused to mail appeal to Anthony Rendina, effectively denying Plaintiff due process right of appeal. Plaintiff was falsely accused of inciting a riot in retaliation by Sgt. Tyson, who had filed complaint against him previous week for refusal to allow Plaintiff to eat breakfast. Hearing Officer Lt. Savage was a witness to false inciting to riot charge.

In retaliation for filing grievances against Sgt. Moran for denying him exercise and showers and physically grabbing and slamming his arm in door while handcuffed, Plaintiff was sent to isolation after striking Sgt. Moran with bar of soap after repeated abuse and harassment. As usual, Major Cunningham, Captain Belanger and supervisory prison officials acted with deliberate indifference to Sgt. Moran's repeated assaults, rule violations, and racial discrimination and harassment of black male prisoners. Even though numerous complaints and grievances were lodged against Sgt. Moran for instigating assaults and harassment against black males, prison officials turned their heads. Internal Affairs Officer Ron Drake has never investigated any complaints of assaults on Plaintiff by staff. In Summer 2003, Sgt. Moran was finally forced to resign after brutal assault on an inmate. However, prison officials showed deliberate indifference and racial discrimination because the inmate assaulted was Caucasian

## XXVI

Once again, Plaintiff was sent to isolation without a hearing. In order that sanction would not be interrupted by appeal, Lt. Savage waited until after Plaintiff had served sanction from Nov. 26 - Dec. 11 before finding Plaintiff guilty on last day of sanction. Again, Lt. Savage refused to send appeal to Appeal Officer Anthony Rendina and began to implement sanctions by denying Plaintiff right of appeal. Repeated complaints to Bureau Chief's Office concerning Lt. Savage's blatant violations of DOC policy were condoned or ignored by Anthony Rendina, Paul Howard and Commissioner Taylor. In fact, Plaintiff served over three months of sanctions because Lt. Savage was allowed to abuse disciplinary procedure.

When Plaintiff retaliated against assault by throwing tray at Sgt. Evans, Lt. Stanton ordered QRT① to assault Plaintiff while handcuffed. Plaintiff was transferred to isolation without hearing until after his isolation status was expired from July 27, 2003 - August 11, 2003. Again, Plaintiff was given cursory hearing by Lt. Savage and found guilty of assaulting Sgt. Evans.

As in the case of Sgt. Moran, Plaintiff was returned to same unit where Sgt. Evans worked in order to further abuse and harassment against him. Again, prison officials showed deliberate indifference and foolish administrative decision by placing Plaintiff and his assailant in dangerous situations. As Sgt. Evans continued to abuse and harass Plaintiff by refusing to feed him, Plaintiff retaliated by throwing urine at Sgt. Evans and officers. Again, Sgt. Evans was never disciplined for violating policy and abusing Plaintiff. His complaints were ignored by Capt. Sagers, Lt. Harvey, Staff Lt. Burton, Deputy Warden McGuigan and Warden Tom Carroll.

## XXVII

In retaliation, one of Sgt. Evans's officers, c/o Connolly planted broken radio ~~evidence~~ in Plaintiff's door and claimed that it was dangerous contraband. Lt. Bartels and c/o Connolly then confiscated Plaintiff's personal radio for evidence and disciplinary hearing. Plaintiff was in court on October 10, 2003, when incident occurred and was unaware of unauthorized "shakedown" until he returned.

After Lt. Bartels refused to tell Plaintiff where radio was, Plaintiff confronted c/o Connolly on Oct. 14, 2003. While c/o Connolly attempted to put coffee in flap, Plaintiff pushed coffee away and told Connolly that "he didn't want any," spilling coffee on c/o Connolly. Sgt. Evans and c/o Connolly then fabricated charge against Plaintiff by saying that Plaintiff threw coffee at him. Plaintiff has never had a hearing for alleged broken antenna contraband, even though it has been over six months since incident.

Capt. Sagers and Lt. Harvey then ordered QRT(2) to assault Plaintiff by having maintenance worker cut off cell door after Plaintiff had barricaded himself in his cell. Plaintiff was again transferred to isolation and was given a cursory hearing by Lt. Savage over a month after release from isolation on Oct. 29, 2003.

In addition to other disciplinary procedure violations, Plaintiff was repeatedly denied witnesses and right of confrontation. Also, he was not given copies of disciplinary charges before hearings on several occasions and was unaware of several charges.

## GRIEVANCE PROCEDURE

Immediately after being transferred to SHU in March, 2002, Plaintiff noticed that Cpl. Merson refused to follow grievance procedure by rejecting grievances sua sponte without attempting a hearing

## XXVIII

or resolution. Even though certain actions are not grievable through Grievance Procedure (these are listed in Grievance Procedure), Cpl. Merson was denying grievances under category of <u>OTHER</u>, as she continued to "invent" reasons for rejecting grievances.

After numerous rejections with no attempt at resolution, Plaintiff began to send grievances directly to Cpl. Merson's immediate supervisor, Deputy Warden Burris, who condoned and signed off on Cpl. Merson's rejected grievances.

Plaintiff then began to complain and send grievances directly to Assistant Bureau Chief Richard Seifert, who also condoned Cpl. Merson's actions even though there is no policy allowing Cpl. Merson to reject grievances without attempt at resolution or hearing. Plaintiff's grievances included serious constitutional and health risk issues such as lack of clothing and hygienic supplies, denial of exercise and shower, contagious diseases caused by unsanitary living conditions and biting insects, brutal assaults and denial of medical treatment. All grievances were denied by Cpl. Merson. Those not denied were not followed up with a hearing or ignored. In the two years that Plaintiff has been housed in SHU, Plaintiff conservatively estimates that he has filed over 100 grievances. To this date, Cpl. Merson and Grievance Officers have never granted Plaintiff a hearing. This also includes medical grievances.

Because Cpl. Merson and prison officials have continually denied or interfered with Plaintiff's right to a hearing, he has been denied due process and impeded from exhausting his available administrative remedies under PLRA. This allows Assistant Bureau Chief, Warden, and other supervisory administrative officers to circumvent responsibility because issues are not brought to

## XXIX

their attention in appeals from Cpl. Merson's denials. Denied grievances are not allowed to be appealed.

While housed in SHU in 2002, Plaintiff learned that Grievance Procedure is certified in May of each year by Delaware Center for Justice (DCJ), a nonprofit agency that was created as an inmate advocacy organization. However, with a little research, Plaintiff learned that DCJ had a contract-services agreement with DOC to oversee and certify Inmate Grievance Procedure. This contract was signed in 1997 after Congress relaxed prison regulations that required certification by the Attorney General before passage of PLRA. Not surprisingly, DCJ has "certified" DOC Policy 4.4 of Inmate Grievance Procedure and has refused to "bite the hand that feeds them." Numerous complaints and grievances to Ms. Shakeerah Haikal, Ms. Camille Pringle, Mr. Littleton Mitchell, and Frank Scarpetti have gone ignored or unanswered. These non-actions by "certification" agency allowed Plaintiff to be continually denied due process and showed deliberate indifference to his constitutional rights.

Likewise, the Grievance Medical Committee is overseen by First Correctional Medical (FCM), who contracts prison medical services for DCC. Despite numerous complaints about denial and deliberate indifference to medical needs and refusal to dispense pain and treatment medication by reversing staff, FCM and Grievance Medical Committee have refused to grant Plaintiff a hearing on issues. This impediment of exhaustion of administrative remedies has caused irrevocable injury to Plaintiff's health and safety.

~~XXX~~

## DISCRIMINATORY CLASSIFICATION AND LOSS OF PRIVILEGES

Because SHU inmates are not allowed group therapy program treatment by DCC, prison officials incorporated program and drug treatment through video TV. These measures were included in Commissioner's budget request and were funded by General Assembly. Inmates were required to sign for TVs and were responsible for any damage to them. All inmates were required to have TVs, who were involved in court-ordered treatment programs.

Immediately, after about a year of TV programming, SHU staff began to use TVs as punishment against inmates who violated rules, even though there was no disciplinary policy authorizing loss of programming TVs as punishment. Prison officials later sold confiscated TVs in Inmate Commissary and kept the profits for personal use.

When Plaintiff was placed in SHU on March 8, 2002, as a pretrial detainee, Counselor Kramer refused to provide him with TV even though all other inmates were given TVs in pretrial SHU. After Plaintiff was sentenced on March 27, he was transferred to sentenced pod and was told that he would be getting program TV by Counselor Kromka. Again, Capt. Belanger and Counselor Kromka forced Plaintiff to wait until May 8, 2002, to get TV and start programming. Plaintiff complied with Level I programming and was promoted to Level II status and privileges.

After C/O Neal threw hot coffee at Plaintiff during breakfast in Nov. 2002, Plaintiff was transferred to another pod without his TV. He later was sent to isolation after physical

### XXXI

confrontation with Sgt. Moran. When he returned from isolation in Dec. 2002, he was brought back to unit without being given his TV privileges.

In 2003, Capt. Belanger, Major Cunningham, and SHU counselors concocted the policy of only letting inmates at Q.O.L. Level II receive TVs. When Plaintiff inquired about receiving his TV, Counselor Kramer told Plaintiff to complete Level I programming without TV. Plaintiff informed Counselor Kramer that he had already completed Level I essays and was not going to repeat them. Counselor Kramer and SHU staff refused to give Plaintiff TV even though he was at Q.O.L. Level II. Again, SHU staff violated its own policy in order to violate Plaintiff's equal protection rights. In order to justify non-receipt of TV, Counselor Kramer and SHU Q.O.L. Committee decreased Plaintiff's Q.O.L. to Level I in March, 2003. Since that time, Counselor Tom Zanda has continued this discriminatory policy against Plaintiff.

While in SHU, Plaintiff and other SHU inmates have not received same supply of food as non-SHU inmates. In 2002, Capt. Belanger and Major Cunningham discontinued brand name box cereals and replaced them with generic brands that were less nutritious and were partially stale due to being exposed to atmospheric elements. This was allegedly done for paper excess reasons, but it was not discontinued for non-SHU inmates, who accumulate seven times as much paper.

Also, SHU inmates were never given cold fresh water during meals as non-SHU inmates have the option. SHU inmates are required to drink from chlorinated toilet water attached to toilet in room. From March 2002 to Dec. 2003, Plaintiff never received

<u>XXXII</u>

a cup of fresh water while in SHU. Not only did this cause substantial deterioration in his health, but coupled with denial of exercise and unsanitary conditions, these conditions are main reasons that Plaintiff and prison inmates are susceptible to contamination, disease, and death. On several occasions, Artesian Water Company ~~needed to be called to SHU prison~~, which supplies water to DCC, needed to be called to SHU prison because of contaminated water supply.

Finally, the DCC Classification process is inherently unfair and arbitrary as inmates are penalized and punished for discriminatory factors such as age, unsentenced charges, disciplinary sanctions from an outside institution, and even disciplinary sanctions that were imposed during a previous incarceration up to five years ago. These factors are unfairly punitive and are not based on legitimate penological interests. Needless to say, Classification is based on other discriminatory factors such as race and favoritism as evidenced by the high percentage of whites in minimum security and higher job grade opportunities, whereas blacks are overwhelmingly classified to high or maximum security and given menial low grade jobs. In fact, SHU has approximately 90% black and Hispanic population, even though they only constitute 67% of all inmates. Even though DCC I.B.C.C. Board supposedly has an Appeal Process, none of Plaintiff's request for Appeals of his Classification have been responded to IBCC, Jayme Jackson, or Anthony Rendina.

V.   Relief

(State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.)

Defs. 1-4, 11-33, 41, 42 8th and 14th Amendment Cruel and Unusual Punishment of excessive force, failure to protect, failure to intervene, deliberate indifference, retaliation, unsanitary health and safety conditions, due process, intentional infliction of emotional distress, punitive restraints, denial of exercise and shower

Defs. 1,2,10,43-52 1st Amendment Right to Privacy, Violation of confidentiality, 8th Amendment Delay and Denial of Medical Care, Deliberate Indifference

Defs. 1-5, 7-11 1st and Sixth Amendment - Denial and Interference of Access to Courts and Right to Self-Representation, Refusal to Mail Legal Letters and opening and reading of legal mail, Violation of Confidentiality, Right to Privacy

Defs. 1-6 11-42 8th and 14th Amendment - Due Process and Equal Protection - Retaliation, Disciplinary Sanctions, Punitive Classification, and Loss of Privileges; Unreasonable Searches, Deliberate Indifference

Signed this 19th day of December, 20 05

_Kevin L. Dickens_
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

12/19/05                    _Kevin L. Dickens_
Date                         (Signature of Plaintiff)

-4-



From: Kevin E. Deckens
SBI# [illegible]
Delaware Correctional Center
Smyrna, Delaware 19977

Office of the Clerk
U.S. District Court
844 N. King Street, Lockbox 18
Wilmington, DE 19801

LEGAL MAIL