*AMENDED COMPLAINT*

(Rev. 4/97)

# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

## Instructions for Filing a Complaint by a Prisoner
## Under the Civil Rights Act, 42 U.S.C. § 1983

04-201

To start an action you must file an original and one copy of your complaint for each defendant you name and one copy for the court. For example, if you name two defendants you must file the original and three copies of the complaint. You should also keep an additional copy of the complaint for your own records. **All copies of the complaint must be identical to the original.**

Your complaint must be legibly handwritten or typewritten. You, the plaintiff, must sign and declare under penalty of perjury that the facts are correct. If you need additional space to answer a question, you may use the reverse side of the form or an additional blank page.

Your complaint can be brought in this Court only if one of the named defendants is located within this district. Further, you must file a separate complaint for each claim that you have unless they are all related to the same incident or issue.



In order for this complaint to be filed it must be accompanied by the filing fee of $150.00. In addition, the United States Marshal will require you to pay the cost of serving the complaint on each of the defendants. If you are unable to prepay the filing fee and service costs for this action, you may petition the court to proceed in forma pauperis, by submitting an Application to Proceed Without Prepayment of Fees.

You will note that you are required to give facts. THIS COMPLAINT SHOULD NOT CONTAIN LEGAL ARGUMENTS OR CITATIONS.

When these forms are completed, mail the original and the copies to the Clerk of the U. S. District Court for the District of Delaware at the following address:

Clerk
U. S. District Court
J. Caleb Boggs Federal Building
Lock Box 18
844 N. King Street
Wilmington, Delaware 19801

(Rev. 497)

## FORM TO BE USED BY A PRISONER IN FILING A COMPLAINT
## UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. §1983

### UNITED STATES DISTRICT COURT
### DISTRICT OF DELAWARE

## Kevin L. Dickens

(Enter above the full name of the plaintiff in this action)

Commr, Stan Taylor, Bureau Chief Paul Howard, Richard Seifert, Anthony Rendina, IBCC, et al, John Ryan, Mike Little, Joe Hudson, Ms. Havel, Cpl. Oney, Warden Tony Carroll, Dep. Warden Betty Burns, Dep. Warden McGuigan, Major Cunningham, Capt. Sayers, Capt. Belanger, Staff Lt. Williams, Staff Lt. Burton, Lt. Savaye, IGC Lise Merson, Sgt. Evans, Sgt. Moran, c/o Harris, Sgt. Tyson, c/o Neal, QRT ① et al, Lt. Stanton, c/o Gardels, Lt. Harvey, Lt. Secord, Lt. Welcome, c/o Rainey, QRT ② et al, Jayne Jackson, Lt. Porter, Cpl. Kromka, Counselors Kromka, Kramer, Zinda, Brian Engrem, Ron Drake, Major Holman

V.

First Correctional Medical, Dr. Arronburl, Nurse Brenda Holwerda, Nurse Courtney Doe, Nurse Cindy Doe, Medical Director

V.

(Enter above the full name of the defendant(s) in this action)

Delaware Center for Justice, Shakeerah Haikal, Camille Pringle, Littleton Mitchell, Frank Scarpetti

I.     Previous lawsuits

A.     Have you begun other lawsuits in state or federal courts dealing with the same facts involved in this action or otherwise relating to your imprisonment? YES [ ]     NO [X] Has pending Dickens v. Manpower, et al. 03-310 JJF

B.     If your answer to A is yes, describe the lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline).

1.     Parties to this previous lawsuit

Plaintiffs _____

_____

Defendants _____

_____

2.    Court (if federal court, name the district; if state court, name the county)

_____

3.    Docket number _____

4.    Name of judge to whom case was assigned _____

5.    Disposition (for example: Was the case dismissed?  Was it appealed?
      Is it still pending?)

_____

6.    Approximate date of filing lawsuit _____

7.    Approximate date of disposition _____

II.    A.    Is there a prisoner grievance procedure in this institution?  Yes [X] No [ ]

       B.    Did you present the facts relating to your complaint in the state prisoner
             grievance procedure?  Yes [X]  No [ ]

       C.    If your answer is YES,

             1.    What steps did you take? Filed grievances and appeals through Grievance Procedure.
      Also complained directly to Commissioner, Office of Disciplinary Procedure, and Classification
      Bureau Chief, and upper management officials.

             2.    What was the result? All grievances and appeals were rejected or ignored.

       D.    If your answer is NO, explain why not Any impediment was due to improper aborting
      of procedure by Hearing Officers and administrative officials.

       E.    If there is no prison grievance procedure in the institution, did you complain to
             prison authorities?  Yes [ ]  No [ ]  N/A

       F.    If your answer is YES,

             1.    What steps did you take? _____

             _____

             2.    What was the result? _____

             _____

III.    Parties

(In item A below, place your name in the first blank and place your present address
in the second blank. Do the same for additional plaintiffs, if any.)

A.    Name of Plaintiff  Kevin L. Dickens

Address  Delaware Correctional Center, 1181 Paddock Road, Smyrna, DE 19977

(In item B below, place the full name of the defendant in the first blank, his official
position in the second blank, and his place of employment in the third blank. Use
item C for the names, positions, and place of employment of any additional defendants.)

(1) Comm. Stan Taylor, (2) Bureau Chief Paul Howard (3) Richard Seifert

B.    Defendant (4) Anthony Rendina, (5) John Ryan  is employed as  Administrative

Dept. of Corrections

Officers  at  245 Mckee Road, Dover, DE 19903

(6) IBCC, et al., (7) Mike Little, (8) Joe Hudson (9) Ms. Havel, (10) Cpl. Orey (11) Warden Tom Carroll,

C.    Additional Defendants (12) Dep. Warden Betty Burris (13) Dep. Warden McGuigan (14) Major Cunningham (15) Cpt. Sager
(16) Capt. Belanger, (17) Staff Lt. Williams, (18) Staff Lt. Burton, (19) Lt. Savage, (20) IGC Lise Merson, (21) Sgt. Evans, (22) Sgt. Moran, (23) c/o Harris (24) Sgt.
Tyson, (25) c/o Neal, (26) QRT (1) et al., (27) Counselor Kronka, (28) c/o Gardels, (29) Lt. Harvey (30) Lt. Secord, (31) Lt. Welcome, (32) c/o Rainey, (33) QRT (2) et
(34) Jayme Jackson (35) Lt. Porter, (36) Cpl. Kronka, (37) Counselor Kronka (38) Counselor Kramer (39) Counselor Zenda, (40) Brian Engrem, (41) R
Drake (42) Major Holman are employed as administrators, support officers, officers and supervisors at DCC, 1181 Paddock Road, Smyrna DE 1897.
(43) First Correctional Medical, (44) Dr. Arronburt, (45) Nurse Brenda Holwerda, (46) Nurse Courtney Doe, (47) Nurse Cindy Doe, (48) Medical Director are
employed as medical staff at 1575 Mckee Rd, Suite 201, Dover, DE 19904
(49) Delaware Center for Justice, (50) Shakeerah Haikal, (51) Camille Pringle, (52) Littleton Mitchell, (53) Frank Scarpetti are employed as
non-profit contractor with DOC as inmate advocates at 100 West 10th St., Suite 905, Wilmington, DE 19801

IV.    Statement of Claim

(State here as briefly as possible the facts of your case. Describe how each defendant
is involved. Include also the names of other persons involved, dates, and places.
Do not give any legal arguments or cite any cases or statutes. If you intend to allege
a number of related claims, number and set forth each claim in a separate paragraph.
Use as much space as you need. Attach extra sheet if necessary.)

As a pretrial detainee on February 15, 2002 Appellant was denied opportunity to eat breakfast by Sgt. Teddy
Tyson, as he slammed door in Appellant's and seven other inmates's faces as they approached hallway.
Despited repeated regerts for Sgt. Tyson to open door by inmates, he refused to let inmates out to eat breakfast.
When Staff Lt. Garrison came to tier, he also refused to allow inmates to eat breakfast. Instead, he told
Sgt. Tyson to give Plaintiff a disciplinary report for banging on tier door and being disorderly for com-
plaining about not being allowed to eat breakfast. Plaintiff then sent a complaint letter to
Deputy Warden Burris complaining of Sgt. Tyson's repeated denials of inmates' rights to eat
and also physically assaulting inmates while handcuffed.

I

Deputy Warden Burris wrote memo to Plaintiff, stating that Security Superintendent Holman "would be investigating the matter and getting back to Plaintiff." In almost two years, Plaintiff has not heard from Security Superintendent Holman, despite repeated requests.

On the very next week, on Feb. 22, 2002, Sgt. Tyson worked overtime on day shift (8-4) at the chow hall. In retaliation for incident the previous week and filing a complaint, Sgt. Tyson tried to handcuff Plaintiff after instigating an incident an argument with him after Plaintiff told another inmate that "he was a clown." Plaintiff continued to walk to chow hall and when Sgt. Tyson grabbed him. Plaintiff pushed him away and walked into chow hall. Plaintiff was well aware of Sgt. Tyson's tendency to assault inmates while handcuffed.

For this incident, Plaintiff was sent to "the hole" in Bldg. C for 15 days without a hearing. While in isolation, Plaintiff was not given exercise or shower for six consecutive days without change of clothing. Furthermore, water was cut off from cells and toilets were only flushed at officer's discretion. Plaintiff was also not given any soap, wash cloth, towel, toothpaste or toothbrush for his hygiene. Meanwhile, area lieutenants subjected Plaintiff to repeated and harassing strip searches each day even though he never left his cell.

During his isolation, Plaintiff was in jury trial. Plaintiff, who was pro se defendant, was not allowed to prepare and assist in his defense because officers confiscated his legal material. Prison officials also refused to allow him to dress in street clothes, forcing him to wear prison uniform at trial. Only

## II

after he complained to trial judge did prison officials allow Plaintiff to take shower and brush his teeth.

After not being given legal documents first day of trial, the Court ordered corrections officials to allow Plaintiff to have his legal documents. However, corrections officials refused to allow Plaintiff to prepare his defense during his trial by refusing to give him legal documents in his cell. As a direct result of officer's actions, Plaintiff was found guilty of charges in New Castle County Court of Common Pleas.

After release from isolation status on March 8, Plaintiff was transferred to SHU Pretrial for disciplinary reasons, again without a hearing. While in SHU Pretrial, corrections property officials refused to bring Plaintiff's property to him, forcing him to not be able to take showers or change clothes because SHU staff refused to give him towels or change of clothes. When Property Officer, Cpl. Morgan, finally brought property on March 15, she did not have legal documents. When she tried to force Plaintiff to sign property release form, Plaintiff refused because there was no legal material. She then took property away because Plaintiff would not sign for incomplete property form. After Cpl. Morgan and Cpl. Kromka finally located legal material, property was finally returned to Plaintiff on March 22, exactly a month after disciplinary incident. Plaintiff later discovered that blue binder tablet containing vital legal notes and papers had been lost or discarded by property officers.

Later in April, 2002, Plaintiff was found guilty in cursory hearing by Staff Lt. Bernie Williams. When Plaintiff sent him appeal form, he refused to send it to Appeal Chief, Special Programs Director Anthony Rendina, denying Plaintiff's right to appeal.

## III

Even though DOC Policy clearly stated that an appeal would stay the disciplinary sanction imposed, Hearing Officers Captain Green, Staff Lt. Bernie Williams, Staff Lt. Roberts, and Lt. Savage circumvent policy by holding cursory hearings after isolation period is over in order to prevent inmates from staying disciplinary sanctions pending decision of Appeal Officer.

In November, 2002, after complaining and filing several grievances concerning SHU officers c/o Neal and c/o Jackson refusing to serve breakfast sanitarily by wearing protective headgear, Plaintiff began to refuse to eat breakfast after finding hair particles and contracting food poisoning. In retaliation, c/o Neal threw hot coffee in cell at Plaintiff. Fortunately, Plaintiff was not struck by this incident but he filed grievance where he angrily told prison officials that he would try to kill officer if this officer ever threw hot coffee on him. To this grievance, Capt. Belanger and Major Cunningham covered up c/o Neal's actions by reenacting a false scenario where they pretended that coffee had accidentally spilled from tray. Plaintiff was then moved to another building away from c/o Neal.

After being moved, Plaintiff immediately began to be harassed by Sgt. Michael Moran. Sgt. Moran had recently been knocked out by black inmate after he had instigated a racial incident and had pressed criminal charges against inmate. He also had cut water off from showers on another black inmate and instigated a confrontation with QRT by saying that the black inmate was disorderly and threatening while in shower.

When Plaintiff came on tier, he became Sgt. Moran's next target. He, at first, refused to allow Plaintiff to use any clean shower. Later, when Plaintiff attempted to use upstairs shower, Sgt. Moran snatched his arm while he was handcuffed in rear and

IV

pulled him halfway down the stairs, almost causing serious injury as Plaintiff stumbled downstairs. He then pulled Plaintiff to his cell with c/o Atkins and other unnamed c/o and slammed his arm in cell door, bruising it.

Plaintiff wrote grievances concerning Sgt. Moran's actions, but they were denied or ignored. At other times, Sgt. Moran would refuse to allow Plaintiff out of his cell for rec and shower, and falsify disciplinary reports and say that Plaintiff refused. After last incident assault against Plaintiff, Plaintiff finally took matters into his own hands and threw soap bar and hit Sgt. Moran in the head. For this action, Plaintiff was sent to isolation for 15 days without a hearing. On the last day of isolation, Lt. Savage decided to have a cursory hearing and finds Plaintiff guilty so that an appeal would be futile.

In an act of deliberate indifference to Plaintiff and staff safety, in Dec. 2002, prison officials transferred Plaintiff back to same building with racist officer, Sgt. Moran. Sgt. Moran immediately began the same harassment that he had done earlier by refusing to allow Plaintiff's right to exercise and shower and filing false disciplinary action against him. It was only after Plaintiff threatened to punch Moran in the face if he tried to handcuff him, that he finally stopped harassing Plaintiff. Sgt. Moran had already been knocked out twice in recent months by black inmates. Sgt. Moran was finally forced to take early retirement after assaulting another inmate while handcuffed; however, the inmate that was assaulted was Caucasian.

In February, 2003, Plaintiff began to be harassed by c/o Harris after filing numerous grievances against staff for unsanitary conditions and health and safety violations. C/o Harris

V

took exception to this and ordered a retaliatory shakedown on Plaintiff with c/o Newman and c/o Baynard. During shakedown, c/o Harris immediately began to read and search through Plaintiff's legal mail and cases. Because Plaintiff's jumpsuit was partially open, exposing his "fly", c/o Harris asked him loudly whether he was a homosexual. He then took that opportunity to grab Plaintiff and drag him down hallway while handcuffed, showing other inmates his open "fly" and yelling that Plaintiff was a homosexual.

After completing "shakedown", he then took one handcuff off and held Plaintiff's wrist and said that "he was waiting for Plaintiff to make a wrong move." At this point, c/o Baynard, told c/o Harris that "it was his call," the code for an assault on an inmate. After threatening Plaintiff for a few minutes, c/o Harris finally uncuffed Plaintiff's other wrist and told him that "We'll be back."

After complaining in several grievances to prison officials about c/o Harris's threats and attempted assault, along with his personal knowledge and possible involvement in fellow officer's drug dealing, c/o Harris began to label Plaintiff as a snitch to other inmates. In one incident, c/o Harris had repeatedly complained to another inmate about Plaintiff. This inmate was allowed to throw alleged urine on Plaintiff during his yard time on c/o Harris's watch. No disciplinary action was taken against this inmate.

Finally, Capt. Belanger told Plaintiff that he was going to transfer him to another building away from c/o Harris in March, 2003. After discussion and investigation of c/o Harris, Harris came on tier and threatened Plaintiff in front of everyone

VI

and called him a snitch and said that "he was going to get Plaintiff's ass." He later came down with c/o Wynder to handcuff and shackle Plaintiff for transfer. Because he did not have cart to transfer property, Plaintiff immediately suspected foul play and told c/o Harris that he needed a cart to transfer his property. C/o Harris said that "he wasn't getting any cart and to bring [Plaintiff's] ass on." Plaintiff stated that "he wasn't leaving until he got a cart." C/o Harris then tried to pull and grab Plaintiff out of his cell. Plaintiff pushed him back in self-defense. C/o Harris then looked at c/o Wynder and charged at Plaintiff. Plaintiff picked up ink pen in self-defense and c/o Harris and c/o Wynder shut cell door and ran to control room to get Sgt. Lawrence.

When Sgt. Lawrence returned with c/o's Harris and Wynder, Plaintiff told Sgt. Lawrence that "he didn't want c/o Harris to touch him and he was not going to let him handcuff him." Sgt. Lawrence then let c/o's Harris and Wynder transfer him to Bldg. 19 unsupervised after he had handcuffed Plaintiff. While going to Bldg. 19, Plaintiff was brought to Bldg. 20 to see Lt. Welcome. Even though Lt. Welcome had been informed that c/o Harris had been abusing and threatening Plaintiff, he ordered c/o Harris to have contact with Plaintiff by handcuffing him. He then told c/o Harris to write false report of assault against Plaintiff and allowed c/o Harris to continue to abuse, taunt and bump cart against Plaintiff while he was hand-cuffed and shackled.

After being transferred to Bldg. 19, Plaintiff began to experience difficulty with night-time officers not serving food properly and

## VII

sanitarily. Plaintiff filed several grievances and made complaints at least six times to Sgt. Evans and his staff. Because officers refused to wear hats, Plaintiff was experiencing food poisoning and nausea. Again, his complaints went unheard and ignored. In protest, Plaintiff began to throw his tray outside when flap was opened, forcing guards to pick it up. When Sgt. Evans asked Plaintiff why he threw out tray, Plaintiff told him that "he was tired of telling your guards to wear headgear when serving chow." Sgt. Evans then threw a "sucker" punch at Plaintiff, striking him in the nose, through the flap vent. He then closed vent before Plaintiff could retaliate.

For the next few nights, Sgt. Evans told officers not to feed Plaintiff. In retaliation, and in order to get Lt. to come on tier, Plaintiff began to throw urine unsuccessfully at Sgt. Evans and his staff. Lt. Gattis came to tier and immediately wanted to discipline Plaintiff, but Plaintiff told him that he needed to straighten out Sgt. Evans for punching Plaintiff and not feeding him for the last three days. Lt. Gattis then filed false incident report by saying that Plaintiff was suicidal and had several officers escort Plaintiff to the Medical Infirmary Unit. He refused to address Plaintiff's complaints of being assaulted and not being fed by Sgt. Evans.

Plaintiff spent three days in Infirmary for observation and it was determined that Plaintiff was not suicidal and he was released. Lt. Harvey, Capt. Sagers, and Deputy Warden McGuigan then showed callous disregard to both Plaintiff's and officer's health and safety by placing Plaintiff in same cell so Sgt. Evans could investigate another incident with Plaintiff. Plaintiff was told by Sgt. Dunnington after leaving the infirmary to contact Staff Lt.

## VIII

Burton, the Shift Commander, if he had any more problems with Sgt. Evans.

On the next morning, July 27, Plaintiff was given his opportunity to confront Sgt. Evans by throwing tray to strike him after breakfast. Sgt. Evans then called Lt. Stanton, a fellow racist, to take Plaintiff to the hole. Plaintiff informed Lt. Stanton that he needed to speak to Shift Commander, Staff Lt. Burton. Instead of notifying Shift Commander and following policy before use of force, Lt. Stanton summoned QRT ① in order to assault Plaintiff. QRT officers c/o Neal, c/o Stevenson, c/o Jackson, c/o Mike Doe, et al., along with Lt. Stanton immediately began to punch Plaintiff in mouth, face, head, and to kick him in the back. Plaintiff tried to keep his face protected by not allowing them to handcuff him while they were on his back. At that point, Lt. Stanton came into cell and maced Plaintiff twice, forcing two QRT officers to run out of the cell because of inflamed lungs.

After being brutalized for about ten minutes, Plaintiff was brought out of cell, bleeding from mouth and nose, with front two teeth of denture knocked out. Plaintiff was then taken to nurse, where Nurse Courtney Doe took cursory blood pressure of Plaintiff and asked whether any officers were injured. She never asked Plaintiff about his injuries or applied any treatment for Plaintiff's bloody mouth and nose or pain. Before taking Plaintiff to Bldg. 18C, "the hole," c/o Neal and c/o Mike Doe taunted Plaintiff by saying that "this is just the beginning, it gets worse in 18." Lt. Stanton then gave QRT a thumbs-up sign and told them "good job" as QRT took Plaintiff to Bldg. 18.

## IX

When QRT was outside of Bldg. 18, c/o Mike told Plaintiff that "he had to be the stupidest nigger in jail." C/o Neal, who is African-American, said "I know that's right." C/o Mike then told other QRT officers "to watch out for the cameras." Just before Plaintiff entered Bldg. 18 and out of view of cameras, c/o Neal hit Plaintiff with a solid hard blow, flush on the face, that swelled up the entire right side of Plaintiff's face. QRT officers then slammed Plaintiff to the floor, while still handcuffed and shackled, and dragged him to the cell. They then left him in cell bleeding profusely from nose and mouth.

Nurse Courtney Doe was then summoned, along with Lt. Stenton, to Bldg. 18. As Plaintiff was bleeding profusely from nose and mouth on the floor, Nurse Courtney falsely wrote that Plaintiff had suffered superficial cuts in the medical report.

After being left in the cell for about two hours with no medical treatment and having lost over a pint and a half of blood, morning Sgt. took Plaintiff to see nurse. Nurse Cindy Doe asked Plaintiff whether he was in pain. Plaintiff stated that "he couldn't feel anything on right side of face and needed something to clean blood from face, mouth, and nose." Nurse Cindy gave Plaintiff one Motrin and four sips of water and said that "all he needed to do was take a shower to clean dried blood off his face." In all, Plaintiff suffered busted nose, mouth, loss of two front teeth to his broken denture, swollen fractured jaw, and partial paralysis of his nose and facial muscles. Plaintiff was not able to eat solid food for approximately two weeks.

When Plaintiff was released from 18C on 08/19/03, Capt. Sagers, Dep. Warden McGuigan, and Lt. Harvey, and Lt. Secord again showed deliberate indifference to Plaintiff's safety by placing him on

X

same tier where he had altercation with Sgt. Evans, so the abuse and harassment could continue. Immediately, Sgt. Evans began his harassment by saying that he was not going to feed Plaintiff. Lt. Gattis came down to tell Sgt. Evans to feed Plaintiff. Even though Lt. Gattis, who is black, was Sgt. Evans's supervisor, Evans told Plaintiff that "he didn't give a damn what Gattis said." Lt. Gattis said nothing about this insubordination and continued to behave like a "house negro", whose only purpose was to cater to white establishment. Eventually, Lt. Gattis was able to persuade Sgt. Evans to feed Plaintiff.

After about a week, Sgt. Evans began to serve food unsanitary again by telling his officers to not wear headgear when serving breakfast in order to provoke Plaintiff. At one point, he used racial tactics by asking "why I didn't say anything when black guy was not wearing hat." After telling same officers to wear headgear, with no results, Plaintiff threw his tray outside and told officers that "if they served trays like dogs, then he would make them fetch trays like dogs." Lt. Roe and Lt. Bartels would consistently write disciplinary reports against Plaintiff, but refused to reprimand wayward staff for violating health and safety institutional rules.

In retaliation for throwing tray outside, Sgt. Evans again began to refuse to feed Plaintiff. Plaintiff continued to file grievances to no avail; therefore, Plaintiff resumed practice of throwing urine at officers in order to get them to serve him breakfast. Again, Lts. Roe and Bartels wrote disciplinary reports against Plaintiff, but refused to reprimand wayward staff for refusing to feed Plaintiff for sadistic and malicious reasons.

## XI

Finally, on October 8, 2003, Shift Commander Staff Lt. Burton was summoned to Bldg. 17 after Plaintiff had barricaded his door and refused to allow Sgt. Evans and staff to do security counts and phone punches after they refused to serve him breakfast. Plaintiff had threatened to throw urine on officers for not feeding him. Staff Lt. Burton ordered Plaintiff to come out of cell for shakedown to search for weapons. After five to ten minutes, Staff Lt. Burton found no illegal contraband and allowed Plaintiff to return to his cell. Staff Lt. Burton then ordered SHU officers to feed Plaintiff.

Two nights later, Plaintiff was brought to Bldg. 20 for transport to court. C/o's Connolly, Blankenship, and Davis then doubled back to shake down Plaintiff's cell while he was not present. During this time, Plaintiff's radio was taken and broken antenna was planted in his door in retaliation for Plaintiff's complaints against staff. The confiscated radio was given to Lt. Bartels, who refused to tell Plaintiff what he had done with radio, despite repeated requests by Plaintiff. He claimed that Capt. Sagers could not do a disciplinary report without 537 property form with radio. Plaintiff was never given a hearing for disciplinary report or shown alleged evidence of radio.

On October 14, when C/o Connolly tried to put coffee on flap during breakfast, Plaintiff pushed coffee away and declined, spilling coffee on C/o Connolly. When Plaintiff asked him where the radio was, he stated that "he had given it to the Lieutenant." He and Sgt. Evans then fabricated disciplinary action against Plaintiff by saying that Plaintiff had thrown coffee at C/o Connolly.

Later on in the morning, Capt. Sagers sent Lt. Harvey and C/o Rainey to Plaintiff's cell, who had jammed his door. Capt.

## XII

Sagers and Lt. Harvey then ordered maintenance to cut open Plaintiff's door. After door was cut open, QRT ② officers rushed Plaintiff, who was lying down in submissive position, and began to punch him in arms, legs and back while c/o Gardels began choking Plaintiff, ~~Lt. Harvey removed Plaintiff's shoes and socks~~ temporarily causing unconsciousness. Lt. Harvey removed Plaintiff's shoes and socks ~~and forced Plaintiff to~~ and forced Plaintiff to walk barefoot to isolation cell. After speaking to Capt. Sagers, Lt. Harvey watched silently as c/o Gardels first elbowed Plaintiff in the head and then punched him in mid-section, all while handcuffed and shackled. Finally, when Plaintiff got to isolation cell, c/o Gardels punched Plaintiff in the mouth while QRT ② officers bent Plaintiff's arms in dangerous positions in order to cause extreme pain and cuts and bruises to wrists.

## A. DENIAL AND LACK OF ADEQUATE MEDICAL CARE AND UNSANITARY CONDITIONS

After Plaintiff was transferred to SHU, he began to experience health complications due to unsanitary living conditions and lack of exercise time. Even though most state and federal institutions mandate one hour of free exercise time per day outside of one's cell, DCC officials have abridged free time to approximately 19 minutes per day or two hours and fifteen minutes per week. Inmates are only allowed time to exercise out of one's cell three times per week. This has caused complications to Plaintiff's health as he has experienced heart and chest pains and shortness of breath. Because

XIII

Plaintiff has a high risk for diabetes because of family history, the lack of exercise is causing anxiety and stress due to health symptoms.

Furthermore, inmates are denied free time to exercise inside away from extreme hot or extreme cold conditions because SHU officers consistently force inmates to use outside facilities in sub-freezing temperatures or extremely hot ozone-dangerous days. If inmates do not use open outside facilities during this time, they are ~~to sub-freezing temperatures~~ denied free exercise time. Also, because dust and filth have accumulated in outdoor and indoor yards for past two years, without any disinfectant or any fumugation of bugs and ants, inmates are consistently susceptible to flu, hay fever, and emphysema.

After putting in several sick calls for toothaches and broken teeth, Plaintiff was finally allowed to see dentist and get treatment six months later. Complications were further caused by SHU policy of not allowing denture cleanser or cream for Plaintiff's partial denture. For almost two years, his grievances and complaints were denied by SHU staff and DOC Bureau Chief and Commissioner.

In mid-summer, 2002, Plaintiff developed an unknown, painful rash in his genital area. First Correctional Medical staff refused to tell Plaintiff medical condition and only applied anti-fungal cream to genital area. Plaintiff had earlier complained about unsanitary conditions of ants, maggots, and bugs crawling in his cell and SHU staff refusing to disinfect and spray tiers and cells. Plaintiff also had complained about SHU officers refusing to give inmate tier worker enough time to thoroughly clean tiers and showers, further increasing chances

## XIV

of infectious and contagious diseases. Inmates have not been allowed to mop their cells in the past two years.

In February, 2003, Plaintiff awoke and found that the genital infection was causing him extreme burning sensation and discomfort to the point that he could not wear underwear. Sgt. Moran and c/o Atkins brought Plaintiff to see Nursing Administrator Brenda Holwerda, who asked to see Plaintiff's genitals. Immediately after seeing Plaintiff's genitals, Nurse Brenda yelled to officers, "He has an STD. You all make sure that you were gloves around him." After blabbing Plaintiff's confidential medical information, Nurse Brenda then told Plaintiff that "he must have gotten it while on the street and that he needed to go back and find out who he contracted it from." This caused much anxiety and embarrassment to Plaintiff as officers blabbed to other inmates about Plaintiff's medical condition and made open mockery by making sure that everyone saw that latex gloves were used when touching Plaintiff.

When Plaintiff was seen by physician, Plaintiff was told that he had contracted a bacterial infection, but it was not an STD, as Nurse Brenda had misinformed Plaintiff. He then ordered a six week treatment in order to remove lesions. After being trained to apply ointment and acid to area, Plaintiff began to apply treatment himself for the next two weeks.

When Nurse Brenda brought prescribed medical treatment to Plaintiff, she told him that "she was going to stand and watch Plaintiff use it." Plaintiff asked in astonishment why she needed to watch Plaintiff apply ointments to his genitals. She stated that it was the correct procedure and even though other nurses had

XV

given him privacy, that she was the Nurse Administrator and the other nurses were wrong. When Plaintiff began to further question her motivation for being a "voyeur", she became angry and snatched back medication and refused to give it to Plaintiff, forcing him to suffer genital pain for another week. She then fabricated medical report and stated that Plaintiff had refused medication.

After Plaintiff was brutally assaulted by SHU officers on 07/27/03, Nurse Courtney Doe fabricated medical report to say that Plaintiff had suffered superficial scratches when she saw Plaintiff lying semi-conscious in a pool of blood. She refused to give Plaintiff any medical treatment.

Later that morning, Sgt. brought Plaintiff to Nurse Station. Nurse Cindy Doe saw Plaintiff's swollen bloody face and asked whether he had pain. Plaintiff said "Yes." She then gave Plaintiff one motrin and four sips of water and told guard that she was done with Plaintiff. When Plaintiff asked whether she had any ice or medication to put on his cuts and shrink swelling, she stated "that" she did not have any ice and because blood flow had stopped, Plaintiff would just need to wash blood off face." She then refused to give him any napkins or cleanser to clean his face.

Later that night, Nurse Brenda came to Plaintiff's cell in isolation to "gawk at" Plaintiff's injuries. When Plaintiff asked her whether he could see doctor, she told him that "his injuries were not serious and all he had to do was to wash his face." She further stated that she did not see any swelling and there was not anything written about Plaintiff's broken jaw. Finally, she told Plaintiff that "he shouldn't have started a fight with

XVI

the officers," showing her callous disregard to Plaintiff's health and safety.

Plaintiff managed to get another inmate to smuggle letter to his mother, detailing the brutal assault, his injuries, and lack of medical treatment. Plaintiff's mother then contacted Warden's Office, and was transferred to Deputy Warden McGuigan, who covered up assault by saying that "officers did not beat Plaintiff while handcuffed, and that Plaintiff had only suffered superficial cuts and smeared blood on face." Plaintiff's mother wisely rejected this dubious alibi and contacted State NAACP, where she happened to speak to Ms. Camille Pringle of Delaware Center for Justice (DCJ). DCJ oversees and certifies inmate grievances for the DOC. Ms. Pringle told Plaintiff's mother that she would contact someone at DCC immediately.

After Warden's Office was contacted, SHU Medical Staff was ordered to take an X-ray of Plaintiff's face and jaw. However, Nurse Brenda decided to further delay treatment by diverting Plaintiff to be seen by Mental Health Counselor, insinuating that Plaintiff's problems were psychological, not physical.

Later, she brought Plaintiff to Nursing Station and tried to interrogate him about his fractured jaw in order to prove that Plaintiff was lying about his injuries. Plaintiff told Nurse Brenda that "he realized that she was part of the conspiracy to cover up his brutal assault and injuries, but he was still demanding an X-ray." She then reluctantly conceded and allowed Plaintiff to have his jaw x-rayed for possible fracture after ten days.

Even though Plaintiff was told by x-ray technician that X-rays would take about a week to get results, Nurse Brenda

## XVII

came to Plaintiff the next day to tell him that x-rays were negative. When Plaintiff asked her how did she get results so fast, she stated that she had called doctor personally to get results. Plaintiff then asked for copy of x-ray report. She said that Plaintiff would need to contact Warden about releasing medical information. Plaintiff has never been provided official medical reports. Despite repeated requests and grievances to administrators to Dr. Arronburl to see specialists about facial paralysis and pain in jaw, Plaintiff was denied any pain medication or follow-up. Instead, he was forced to "heal on his own." This has caused permanent disfiguration and paralysis to right side of Plaintiff's face.

After Plaintiff was released from isolation, he was transferred to cell where his only bedding was "egg shell" foam, causing him back pain and spasms. After he was finally given Motrin for back pain in October, 2003, he again was assaulted by SHU officers on October 14, 2003. This caused him additional back pain and x-ray was taken in December, 2003, where he was shown x-ray with compression on his lower lumbar region. Dr. Arronburl said that x-ray results were negative without referring to back specialist. Plaintiff continues to suffer chronic back pain and spasms. SHU Medical Staff continues to "medicate it" by repeatedly prescribing Motrin without any referral to back specialist.

Plaintiff has also been forced to wear same T-shirt and underwear for last eight months as SHU officers refuse to provide him with required clothing as other inmates, forcing him to be naked underneath jumper On dirty laundry days, further chafing him and irritating his genital infection.

## XVIII.

Meanwhile, even though Plaintiff had suffered loss of front two teeth to his partial denture and had bleeding gums and difficulty eating solid foods, First Correctional Medical Staff delayed and denied him dentures until late December 2003, a period of five months. Even though Plaintiff is legally blind and has been without eeglasses for past seven months, he still did not receive glasses until recently, further causing him chronic headaches and difficulty reading and writing.

Finally, because SHU inmates are required to wear black "boxes" by DOC Policy in order to punish and further restrict SHU inmates' hand movement, this has resulted in pain and cuts and bruises to Plaintiff's wrists, causing numbness. After repeatedly being subjected to restrictions during court transportation, Plaintiff began to experience pain in upper shoulders and chest due to chain belt restraints. SHU Medical Staff and Dr. Brown delayed medical treatment until Plaintiff began to experience heart palpitations and shortness of breath. Fearing that he had symptoms of heart stroke and to avoid heart attack, he requested to see doctor, who prescribed a muscle relaxer for Plaintiff's chest and shoulder muscle sprain and pull.

In order to further demean and degrade Plaintiff and inmates, Nurse Brenda Holwerda invented the policy of pouring medication in inmates' hands instead of placing it in cups in vent as all medications are designed to be. She also reinstituted policy of watching inmates take medication. Because Nurse Holwerda designed these restrictions specifically for Plaintiff, he refused to accept them and told Nurse Brenda that he would take his medication after it was placed on

vent, Nurse Brenda then decided not to place medication on vent and refused to give Plaintiff muscle relaxer treatment, so that Plaintiff could continue to have heart pain and shortness of breath. All complaints to Medical Director and Grievance Committee concerning Nurse Holwerda's racist treatment toward Plaintiff and other black inmates have been denied or ignored. She has also made false disciplinary reports against Plaintiff and even criminal charges against other black inmates in order to further harass and punish them.

## B. LEGAL ACCESS AND RIGHT TO COUNSEL

After Plaintiff was placed in isolation on February 22, 2002, he was denied all access to legal documents while he was pro se defendant in jury trial. On first day of trial, prison officials did not bring legal documents to court and Plaintiff was forced to begin trial without legal documents. Even after court ordered legal documents to be returned to Plaintiff while in isolation, prison officials, citing policy, told Plaintiff that no property, legal or religious, was allowed in cell. Hence, Plaintiff was forced to conduct his trial with inadequate preparation in his defense and denied his right to effective counsel, as he continued to have to make up questions and plan strategy in the middle of proceedings. After a three day trial, Plaintiff was found guilty of two of the three charges on February 28, 2002.

After Plaintiff was transferred to SHU from isolation on March 8, he was denied paralegal services like non-SHU inmates

XX

have access to. Inmates from SHU had to write legal question on SHU Law Library request and send it to Inmate Paralegal to Main Law Library. Not only was this inadequate assistance, but it invaded confidentiality of legal issues and did not allow inmate to discuss merits of his case. Because prison policy does not allow SHU inmates to commingle with non-SHU inmates, SHU inmates are denied personal contact with inmate paralegals. However, SHU inmates are allowed to have personal contact with ~~inmate paralegals~~ general population barbers, in contradiction of policy. Furthermore, represented SHU inmates are allowed to speak to counsel through closed visits, but non-represented SHU inmate are denied paralegal assistance that non-SHU inmates have.

   In January, 2003, SHU Law Librarian Brian Engrem confiscated Plaintiff's legal letter from SHU inmate Ron Proctor and filed a disciplinary report. The letter was in response to complaint to U.S. Dept. of Justice, detailing incidents of inmate assaults that resulted in serious injury and death in DOC that Delaware Attorney General and prison officials had suppressed and covered up. This incident prevents SHU inmates from filing class action suits because prison officials do not allow collaboration on legal claims. Hearing Officer Lt. Larry Savage never returned Plaintiff's legal letter to him, even though prison policy mandates that confiscated legal papers be returned to owner.

   Later, Plaintiff began to have U.S. Dept. of Justice mail "inadvertently" opened by DCC Mailroom Officers. At one point, DCC officers opened Plaintiff's legal mail and deposited highlighted case law that allowed for incidental openings of legal mail in retaliation for grievances filed by Plaintiff.

XXI

From October, 2002, to October, 2003, SHU Law Librarian Brian Engrem continued to cause Plaintiff's legal requests a one-to-two week delay, whereas general population consistently received legal requests within one to two days. This caused Plaintiff to file ineffective and cursory briefs to court in order to meet court deadlines and sometimes caused him to miss court deadlines. Grievances and complaints to Mr. Engrem's supervisors, Mike Little and John Ryan, were denied.

Mr. Engrem also refused to make several legal copy requests, stating that grievances were not considered legal material, even though grievances fall under 1997e(a) PLRA exhaustion requirement. In order to deter inmates from filing legal claims, prison officials instituted policy of 25¢ per page copy. This is higher than 15¢ per page court copy machine fees in state courts. Inmates who have voluminous and complicated legal briefs and appendices with several state and federal cases have amassed thousands of dollars in legal copy fees in a few years. Indigent inmates are forced to forego legal copies and copy briefs by hand instead of acquiring legal copies because of potential for hundreds of dollars in debts for copy fees. Furthermore, the prison refuses to distribute or sell carbon copy sheets to help alleviate exhorbitant copy fees. Inmates are released with hundreds and thousands of dollars in prison debt with very little means of repaying debt, further creating risks of recidivism and crime.

While in isolation, in March, 2002, and August, 2003, Cpl. Krumk. and property officers lost or discarded portions of Plaintiff's court transcripts and legal material and blue binder tablet that contained pertinent notes and case law for his appeals. SHU staff also

## XXII

unfairly restricts number of legal books and/or magazines to two and discards or prevents inmates from pursuing legal education and paralegal courses. Most of this material cannot be duplicated and is forever lost. Plaintiff and other inmates are coerced into signing property release and liability forms before regaining property. Hence, ~~Plaintiff~~ inmates could not discover missing items until after property form was already signed by coercion.

Furthermore, while in isolation from Feb. 22-March 22, 2003, Plaintiff was denied all access to legal material and access to courts. This occurred while in jury trial and denied him adequate defense while he was a pretrial detainee. In August 2003, he was unable to file timely motion and appeal due to his isolation status and denial of access to courts. He was also unable to file reply brief in his post-conviction relief case.

Finally, beginning in January, 2004, Plaintiff and other inmates have been forced to pay postage for all mail, including legal mail in another cost-cutting move that effectively denies inmates access to courts. Even though Commissioner Stanley Taylor originally proposed that only personal mail would require postage, and legal mail would still be mailed at state expense at General Assembly Budgeting Hearing, he did an about-face after receiving funding and reneged by stating that all inmates would be required to purchase postage for legal mail.

This resulted in Plaintiff and other inmates having legal mail returned to them by Cpl. Oney from mailroom. Furthermore, inmates could only buy postage every two weeks from Commissary