XXIII

and policy sets limits on amount of purchases, depending on inmate's Quality of Life (Q.O.L.) Level. Also, Mailroom Officers refuse to mail letters and debit accounts, similar to sick call fees and legal copy fees. Hence, letters without postage stamps are returned and inmates are totally denied access to courts. Plaintiff has filed several motions late and had to file current lawsuit later because of DOC stamp policy. Inmates have continually had claims go unfiled or be denied by Courts for late filings because of DOC stamp policy.

C. DISCIPLINARY PROCEDURE AND RETALIATORY SANCTIONS

DCC Hearing Officers and DOC prison administrators continue to trample Plaintiff's and other inmates' constitutional rights by denying them due process before punishment. DCC Hearing Officers Staff Lt. Bernie Williams, Captain Gloria Green, and Lt. Larry Savage continue to show bias against inmates' version of facts even when evidence is overwhelming in inmates' favor, creating an institutional "Kangaroo court." Lt. Savage has also continued to deny inmate appeals by refusing to send them to Appeal Officer, Anthony Rendina, who supports Hearing Officers' biased findings.

While a pretrial detainee in isolation from Feb. 22 - March 23, 2002, Plaintiff was denied a hearing. He was given cursory hearing by Staff Lt. Williams in April 2002 and found guilty of disciplinary charges. Staff Lt. Williams then refused to mail appeal to Anthony Rendina, effectively denying Plaintiff due process right of appeal. Plaintiff was falsely accused of inciting a riot in retaliation by Sgt. Tyson, who had complaint filed against him previous week for

<u>XXIV</u>

refusal to allow Plaintiff to eat breakfast. Hearing Officer Lt. Savage was a witness to false inciting to riot charge.

In retaliation for filing grievances against Sgt. Moran for denying him exercise and showers and physically grabbing and slamming his arm in door while handcuffed, Plaintiff was sent to isolation after striking Sgt. Moran with bar of soap after repeated abuse and harassment. As usual, Major Cunningham, Captain Belanger and supervisory prison officials acted with <u>deliberate indifference</u> to Sgt. Moran's repeated assaults, rule violations, and racial discrimination and harassment of black male prisoners. Even though numerous complaints and grievances were lodged against Sgt. Moran for instigating assaults and harassment against black males, prison officials turned their heads. Internal Affairs Officer Ron Drake has never investigated any complaints of assaults on Plaintiff by staff. In summer, 2003, Sgt. Moran was finally forced to resign after brutal assault on an inmate. However, prison officials showed deliberate indifference and racial discrimination because the assaulted inmate was Caucasian.

Once again, Plaintiff was sent to isolation without a hearing. In order that sanction could not be interrupted by appeal, Lt. Savage waited until after Plaintiff had served sanction from Nov. 26 - Dec. 11 before finding Plaintiff guilty on last day of sanction. Again, Lt. Savage refused to send appeal to Appeal Officer Anthony Rendina and began to implement sanctions by denying Plaintiff right of appeal. Repeated Complaints to Bureau Chief's Office concerning Lt. Savage's blatant violations of DOC policy were condoned or ignored by Anthony Rendina, Paul Howard and Commissioner Taylor. In fact, Plaintiff served over three months of sanctions because Lt. Savage was allowed to abuse disciplinary procedure.

<u>XXV</u>

When Plaintiff retaliated against assault by throwing tray at Sgt. Evans, Lt. Stanton ordered QRT① to assault Plaintiff while handcuffed. Plaintiff was transferred to isolation without hearing until after his isolation status was expired from July 27, 2003-August 11, 2003. Again, Plaintiff was given cursory hearing by Lt. Savage and found guilty of assaulting Sgt. Evans.

As in the case of Sgt. Moran, Plaintiff was returned to same unit where Sgt. Evans worked, in order to further abuse and harassment against him. Again, prison officials showed deliberate indifference and foolish administrative decision by placing Plaintiff and his assailant in dangerous situations.

As Sgt. Evans continued to abuse and harass Plaintiff by refusing to feed him, Plaintiff retaliated by throwing urine at Sgt. Evans and officers. Again, Sgt. Evans was never disciplined for violating policy and abusing Plaintiff. His complaints were ignored by Capt. Sager, Lt. Harvey, Staff Lt. Burton, Dep. Warden McGuigan, and Warden Tom Carroll.

In retaliation, one of Sgt. Evans' officers, C/o Connolly planted broken radio antenna in Plaintiff's door and claimed that it was dangerous contraband. Lt. Bartels and C/o Connolly then confiscated Plaintiff's personal radio for evidence and disciplinary hearing. Plaintiff was in court on October 10, 2003, when incident occurred and was unaware of unauthorized "shakedown" until he returned.

After Lt. Bartels refused to tell Plaintiff where radio was, Plaintiff confronted C/o Connolly on October 14, 2003. While C/o Connolly attempted to put coffee in flap, Plaintiff pushed coffee away and told Connolly that "he didn't want any," spilling coffee on C/o Connolly. Sgt. Evans and C/o Connolly then fabricated charge against Plaintiff by saying that Plaintiff threw coffee at him. Plaintiff has never had a hearing for alleged broken antenna contraband, even though it has been over six

## XXVI

months since incident.

Capt. Sagers and Lt. Harvey then ordered QRT ② to assault Plaintiff by having maintenance worker cut off steel door after Plaintiff had barricaded himself in his cell. Plaintiff was again transferred to isolation and was given a cursory hearing by Lt. Savage over a month after release from isolation on Oct. 29, 2003.

In addition to other disciplinary procedure violations, Plaintiff was repeatedly denied witnesses and right of confrontation. Also, he was not given copies of disciplinary charges before hearings on several occasions and was unaware of several charges.

D. GRIEVANCE PROCEDURE

Immediately after being transferred to SHU in March, 2002, Plaintiff noticed that Cpl. Merson refused to follow grievance procedure by rejecting grievances sua sponte without attempting a hearing or resolution. Even though certain actions are not grievable through Grievance Procedure (these are listed in Grievance Procedure), Cpl. Merson was denying grievances under category of OTHER, as she continued to "invent" reasons for rejecting grievances.

After numerous rejections with no attempt at resolution, Plaintiff began to send grievances directly to Cpl. Merson's immediate supervisor, Dep. Warden Burris, who condoned and signed off on Cpl. Merson's rejected grievances.

Plaintiff then began to complain and send grievances directly to Assistant Bureau Chief Richard Seifert, who also condoned Cpl. Merson's actions even though there is no policy allowing Cpl. Merson to reject grievances without attempting at resolution or hearing. Plaintiff's grievances included serious constitutional and health risk

<u>XXVII</u>

issues such as lack of clothing and hygienic supplies, denial of exercise and shower, contagious diseases caused by unsanitary living conditions and biting insects, brutal assaults and denial of medical treatment. All grievances were denied by Cpl. Merson. Those not denied were not followed up with a hearing or ignored. In the two years that Plaintiff has been housed in SHU, Plaintiff conservatively estimates that he has filed over 100 grievances. To this date, Cpl. Merson and Grievance Officers have never granted Plaintiff a hearing. This also includes medical grievances.

Because Cpl. Merson and prison officials have continually denied or interfered with Plaintiff's right to a hearing, he has been denied due process and impeded from exhausting his available administrative remedies under PLRA. This allows Assistant Bureau Chief, Warden, and other supervisory and administrative officers to circumvent responsibility because issues are not brought to their attention in appeals from Cpl. Merson's denials. Denied grievances are not allowed to be appealed

While housed in SHU in 2002, Plaintiff learned that Grievance Procedure is certified in May of each year by Delaware Center for Justice (DCJ), a nonprofit agency that was created as an inmate advocacy organization. However, with research, Plaintiff discovered that DCJ had a contract-services agreement with DOC to oversee and certify Inmate Grievance Procedure.

This contract was signed in 1997 after Congress relaxed prison regulations that required certification by the Attorney General before passage of PLRA. Not surprisingly, DCJ has "certified" DOC Policy 4.4 of Inmate Grievance Procedure and has refused to "bite the hands that feeds them." Numerous complaints and grievances to Ms. Shakeerah Haikal, Ms. Camille Pringle, Mr. Littleton Mitchell, and Frank Scarpetti have gone ignored or unanswered. These non-actions by

## XXVIII

"certification" agency allowed Plaintiff to be continually denied due process and showed deliberate indifference to his constitutional rights.

Likewise, the Grievance Medical Committee is overseen by First Correctional Medical (FCM), who contracts prison medical services for DCC. Despite numerous complaints about denial and deliberate indifference to medical needs and refusal to dispense pain and treatment medication by nursing staff, FCM and Grievance Medical Committee have refused to grant Plaintiff a hearing on issues. This impediment of exhaustion of available remedies has caused irrevocable injury to Plaintiff's health and safety.

### E. DISCIPLINARY CLASSIFICATION AND LOSS OF PRIVILEGES

Because SHU inmates are not allowed group therapy program treatment by DCC, prison officials incorporated program and drug treatment through video TV. These measures were included in Commissioner's budget request and were funded by General Assembly. Inmates were required to sign for TV's and were responsible for any damage to them. All inmates were required to have TV's, who were involved in court-ordered treatment programs.

Immediately, after about a year of TV programming, SHU staff began to use TV's as punishment against inmates who violated rules, even though there was no disciplinary policy authorizing loss of programming TV's as punishment. Prison officials later sold confiscated TV's in Inmate Commissary and kept the profits for personal use.

When Plaintiff was placed in SHU in March 8, 2002, as a pretrial detainee, Counselor Kramer refused to provide him with TV even though all other inmates were given TV's in pretrial SHU.

## XXIX

After Plaintiff was sentenced on March 27, he was transferred to sentenced pod and was told that he would be getting programming TV by Counselor Kromka. Again, Capt. Belanger and Counselor Kromka forced Plaintiff to wait until May 8, 2002, to get TV and start programming. Plaintiff complied with Level I programming and was promoted to Level II status and privileges.

After C/O Neal threw hot coffee at Plaintiff during breakfast in November, 2002, Plaintiff was transferred to another pod without his TV. He later was sent to isolation after physical confrontation with Sgt. Moran. When he returned from isolation in December, 2002, he was brought back to unit without being given his TV privileges.

In 2003, Capt. Belanger, Major Cunningham, and SHU counselors concocted the policy of only letting inmates at QOL Level II receive TV's. When Plaintiff inquired about receiving his TV, Counselor Kramer told Plaintiff to complete Level I programming without TV. Plaintiff informed Counselor Kramer that he had already completed Level I essays and was not going to repeat them. Counselor Kramer and SHU staff refused to give Plaintiff TV even though he was at (Q.O.L.) Level II. Again, SHU staff violated its own policy in order to violate Plaintiff's equal protection rights. In order to justify non-receipt of TV, Counselor Kramer and SHU Q.O.L. Committee decreased Plaintiff's Q.O.L. to Level I in March, 2003. Since that time, Counselor Tom Zando has continued this discriminatory policy against Plaintiff.

While in SHU, Plaintiff and other SHU inmates have not received same supply of food as non-SHU inmates. In 2002, Capt. Belanger and Major Cunningham discontinued brand name box cereals and replaced them with generic brands that were less nutritious and were partially stale due to being exposed to atmos-

XXX

pheric elements. This was allegedly done for paper excess reasons but it was ~~disten~~ discontinued for non-SHU inmates, who accumulate 7 times as much paper.

Also, SHU inmates were never given cold fresh water during meals as non-SHU inmates have the option. SHU inmates are required to drink from chlorinated toilet water attached to toilet in room. From March, 2002, to December, 2003, Plaintiff never received a cup of fresh water while in SHU. Not only did this cause substantial deterioration in his health, but coupled with denial of exercise and unsanitary conditions, these conditions are main reasons that Plaintiff and prison inmates are susceptible to contamination, disease, and death. On several occasions, Artesian Water Company, which supplies water to DCC, needed to be called to SHU prison because of contaminated water supply.

Finally, the DCC Classification process is inherently arbitrary and unfair as inmates are penalized and punished for discriminatory factors such as age, unsentenced charges, disciplinary sanctions from an outside institution, and even disciplinary sanctions that were imposed during a previous incarceration up to five years ago. These factors are unfairly punitive and are not based on legitimate penological interests. Needless to say, classification is based on other discriminatory factors such as race, and favoritism as evidenced by the high percentage of whites in minimum security and higher job grade opportunities, whereas blacks are overwhelmingly classified to high or maximum security and given menial low grade jobs. In fact, SHU has approximately 90% black and Hispanic population, even though they

XXXI.

only constitute 67% of all inmates. Even though DCC IBCC Board supposedly has an Appeal Process, none of Plaintiff's requests for Appeals of his Classification have been responded to by IBCC, Jayme Jackson, or Anthony Rendina.

*Kevin L. Dickens*

V.    Relief

(State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statutes.)

Plaintiff seeks unspecified compensatory and punitive damages for excessive force, failure to protect and intervene, deliberate indifference, retaliation, unsanitary health and safety conditions, lack of due process, intentional infliction of emotional distress, punitive restraints, racial discrimination, lack of equal protection, denial of exercise and shower, and denial and unnecessary delay of medical treatment, retaliatory punitive strip searches and classification under the First, Eighth, Fourteenth and Fourteenth Amendments against prison officials and administrators + Defts. 1-4, 6, 11-53. In addition, Plaintiff seeks unspecified compensatory and punitive damages against Defts. 1,2,10,43-48 for violation of medical confidentiality, deliberate indifference, and denial and unnecessary delay of medical treatment, and lack of due process under the First, Eighth, and Fourteenth Amendments. Plaintiff seeks unspecified compensatory and punitive damages against Defts 1-5, 7-14, for First, Sixth, and Fourteenth Amendment violations of denial of access to courts, right to counsel and self representation, violation of legal mail right to privacy. Finally, Plaintiff seeks injunctive relief and restraining order against Defts. 21-29, 32, 33, 45-47 for assault, denial of medical care, failure to protect and intervene under the Eighth and Fourteenth Amendments.

Signed this __4th__ day of __March__, 20__04__

_Kevin L. Dickens_
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

__03/04/04__          _Kevin L. Dickens_
Date                  (Signature of Plaintiff)




I/M Kevin L. Dickens
SB# 256265 UNIT: SHU/18U/5
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977

ATTN: Peter Dalleo, Clerk
U.S. District Court
844 N. King St., Lockbox 18
Wilmington, Delaware 19801

LEGAL MAIL